UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ANNETTE TRINIDAD,

                Plaintiff,                    04 CV 03261 (RJH)

   -   against  -                      **MEMORANDUM OPINION**
                                                **AND ORDER**

NEW YORK CITY DEPARTMENT OF
CORRECTION, et al,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

       Plaintiff Annette Trinidad brings this action against her former employer, the New York

City Department of Correction, and Emmanuel Bailey (collectively, "defendants"), asserting

claims of sexual harassment and hostile work environment because of her sex, and constructive

discharge in contravention of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"),

42 U.S.C. § 2000e *et seq.,* the New York State Human Rights Law, N.Y. Exec. Law § 296 *et*

*seq.,* and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 *et seq.*

Defendants have moved for summary judgment. For the following reasons, this motion is

granted.


**BACKGROUND**

       The following facts are uncontested unless otherwise noted. Plaintiff was employed with

the New York City Department of Correction ("DOC") as a Corrections Officer (C.O.) from

October 1997 until she resigned on July 23, 2003. (March 24, 2005 Deposition of Annette

Trinidad ("Mar. 24 Trinidad Dep.") 18; April 14, 2005 Deposition of Annette Trinidad ("Apr. 14

Trinidad Dep.") 153.) She was assigned to the DOC's Adolescent Reception Detention Center (ARDC) from January 1998 until April 2002, when she transferred to DOC's George Motchan Detention Center ("GMDC") (Defs.' 56.1 Statement ¶7.) Defendant Bailey was assigned to ARDC in May 2000 as an Administrative Deputy Warden and was reassigned to another unit in December 2001. (*Id.* at ¶9.) Bailey supervised plaintiff directly only on one or two occasions while she was on administrative detail in Bailey's office (Mar. 24 Trinidad Dep. 28); however, as a deputy warden, he always was in a superior role to her. (Pl.'s 56.1 Statement ¶2; Mar. 24 Trinidad Dep. 27.)

Plaintiff and Bailey began a romantic relationship in June or July of 2000 that lasted "approximately eight months to a year." (Mar. 24 Trinidad Dep. 34-35.) This would place the end of their relationship between February and May 2001. (Defs' 56.1 Statement ¶13.) Plaintiff testified that, while Bailey never threatened her or her employment status when he asked her out, she decided to date him because "he said he would help me out on the job" if she did so; she also felt "intimidated by … his rank[—]if I didn't go out with him, I felt as though I would be retaliated against by him." (*Id.* at 34-40.)

Plaintiff testified she received work-related benefits from Bailey during their relationship, such as his interceding on her behalf with inmates when they were giving her a difficult time, assistance with her Workmen's Compensation papers following an injury, "holding over" of the prosecution of disciplinary charges for excessive use of force that were lodged against her, a change of post, and allowing plaintiff to use earned compensation time and to drive his car around the facility. (*Id.* at 41-43, 45-50.) According to plaintiff, she ended the relationship after losing interest in Bailey as he was "telling [her] that he would do other things for [her] that he didn't do," and was telling other DOC employees about the details of their relationship. (*Id.* at

58-59.) There is no evidence that Bailey ever took any direct action towards plaintiff following the end of their relationship, other than asking her on a few occasions in the month after their break-up to continue to date him. (*Id.* at 73-81.) Plaintiff does not allege that Bailey ever directly threatened her or her employment status in any way. (*Id.* at 73-74, 81.)

*Plaintiff's EEOC Complaint*

In November 2003, plaintiff's attorney submitted a charge on her behalf to the Equal Employment Opportunity Commission ("EEOC") (the "Nov. 17, 2003 EEOC Charge"). On the submitted form, plaintiff checked off the boxes for "sex" and "retaliation" under the "cause of discrimination" section, and in the "particulars" section of the EEOC form, wrote, "See Attached." (Ex. A to Aug. 31, 2005 Declaration of Keith M. Casella ("Casella Decl.").) Appended to this submission were forty-eight hand-numbered pages of documents (of which page 44 is absent in the version submitted to the Court). (*Id.*)

These documents touched on a wide variety of subjects relating to plaintiff's years of employment with the DOC, and included: a November 12, 2002 "Request for Return of My Firearm" written by plaintiff (*id.* at 2); three pages of reports involving an inmate named Anthony Green (*id.* at 3-5.); a March 22, 2002 memorandum to the warden from plaintiff entitled "Physical/Verbal Abuse and On Going Harassment from Captain Patterson Towards C.O. Trinidad," which discusses an incident that had occurred two days earlier between plaintiff and Patterson, a female corrections employee (*id.* at 6-10);[1] a July 1, 2001 interdepartmental

---

[1] The memorandum describes how Captain Patterson apparently took offense at a comment plaintiff made to another captain, Hudson, as she requested a copy of an incident briefing Hudson had written up. Plaintiff alleges that Patterson "screamed in her face" and pinned her in a doorway with her body while gripping her forearm. Plaintiff indicated that "Captain Patterson continually harasses me every time she is around me" and that she had a "list of several reasons why Capt. Patterson has a growing hatred of me," noting other verbal disagreements the two had

memorandum from plaintiff entitled "Harassment/Creating A Hostile Work Environment Towards C.O. Trinidad #15842 from C.O. Berkeley #5102," which describes three incidents, occurring on June 12, 24, and July 1 of 2001, in which C.O. Berkeley, a male employee, allegedly screamed obscenities at plaintiff and made an offensive comment about her body (*id.* at 11-12);[2] a March 26, 2000 document relating to minor injuries suffered by plaintiff following an altercation with an inmate (*id.* at 13); a January 16, 2003 memo from plaintiff appealing the decision to extend plaintiff's designation as chronically absent (*id.* at 14); an undated memo from plaintiff regarding excessive use of force charges apparently levied against her following the March 26, 2000 inmate incident, and plaintiff's feelings that her supervisor, a Captain Shaheed, committed acts of intimidation and retaliation in connection with his issuance of these charges against her (*id.* at 15-16); plaintiff's Employee Performance Report, which notes her designation as chronically absent (*id.* at 45); an undated handwritten document written by Captain Patterson describing a verbal statement given to her by plaintiff regarding an inmate incident, with edits written in by Trinidad and signed by both women (*id.* at 46); and, a January 7, 2003 Department of Corrections memorandum to plaintiff noting her designation as "Chronic Absent." (*Id.* at 47.)

---

had. She also explained that she believed that Patterson "was jealous of a personal relationship I had with Deputy Warden Bailey. I beleive [sic] she liked him and wanted to date him and would always give me dirty looks when he and I were conversating in a public area." Plaintiff also indicated she believed there was "some sort of connection" between Patterson and a Captain Shaheed, and that because plaintiff "once had a very big problem with Capt. Shaheed … I [believe] Capt. Shaheed told Capt. Patterson the problem and ever since then she was on a personal crusade for vengeance against me." *Id.*

[2] The June 12 incident appears to have referenced the relationship with Bailey, as plaintiff describes Berkeley in her memorandum as screaming at her in the following manner: "He went on to tell me 'HIS' way of running an A post, which did not comply with DOC rules and regulations. When I informed him of that he said 'I don't give a [expletive deleted] what dep[uty] you are [expletive deleted], you are a [stupid] bitch and I can't wait to have you [transferred]!'"

Along with these documents, plaintiff also included an approximately twenty-eight page handwritten explication of a variety of events that occurred during plaintiff's DOC employment, as authored by plaintiff. (*Id.* at 17-43.) At her deposition, plaintiff described this document as her "synopsis to my lawyer of the events that occurred to me in the Department of Correction," which she prepared after her resignation in July 2003. (Apr. 14, 2005 Trinidad Dep. 139-41.) The document discusses incidents including: a July 29, 1999 threat from female C.O. Cade (Ex. A to Casella Decl. at 17); the aforementioned March 26, 2000 incident involving inmate Cruz, Captain Shaheed, and a female C.O., Pinnachio (*id.* at 18-23); plaintiff's romantic relationship with defendant Bailey beginning on June 28, 2000 and ending by August or September 2001, and subsequent behavior by Bailey (*id.* at 24-26);[3] harassment from Berkeley and plaintiff's report of this incident to the EEOC (*id* at 26); March 20, 2002 and April 9, 2002 incidents

_____

[3] Plaintiff's (unsworn) description of the relationship reads as follows: "On June 28, 2000 I became romantically involved with Deputy Warden [Emmanuel] Bailey (Black male). He was assigned as Security Deputy Warden of the … [ARDC.] In August of 2000 he began to tell me on a daily basis that he was in love with me we spoke about marriage ect. [sic]. I would go to his house in Long Island and met all of his children and … one of his brothers. By the beginning of the next year 2001 approximately January or February our relationship cooled down [considerably.] I began to see him less and less and began to see [and] hear that he was romantically involved with several females in and out of ARDC. Within this time period 6/28/00 to about 1 or 2/2001 DW Bailey told all his friends (officers and civilians) that I was his 'Girl' … I was dating him and he was having sex with me, he would tell them of his sexual experiences with me. I broke up … stopped seeing the DW in Month 8 or 9 of 2001 … he was very upset and hurt[.] DW Bailey would try to get my attention by when I was walking in the corridor he would be down on the other end see me walking towards him he would tell the captain that he was with to say something to me like 'Tuck your shirt in better.' 'Why aren't your shoes shined.' 'Where are you going officer.' Small minor things to get my attention so I would later on tell him (DW Bailey) 'Captain So+So said this or that to me.' He (DW Bailey) would say to me (with a sly smile on his face) 'Yeah I told him or her to do it.' Then giggle and laugh at me. That behavior made me very scared and afraid to go to work or to walk down the corridor when I was at work. Soon I was not speaking to DW Bailey in hope of DW Bailey just leaving me alone but the behavior got worse he would order me to his private office for no reason then try to give me his [illegible] home number and ask me to call him or tell me how the female officers would hit on him (ask him out on a date or offer him sex). I did not show any [e]motion to his behavior thinking he would leave me alone." *Id.*

involving Captain Patterson, and a subsequent interview about these incidents with Internal

Investigations (*id.* at 27-29); discussion of a visit to the emergency room she made from work

while pregnant (*id.* at 30); various October 2002 incidents involving Captain Durante and

Assistant Deputy Warden Duffy and Chin (*id.* at 30-34); a November 2, 2002 incident with

Deputy Warden of Security Garcia (*id.* at 34-35); a March 8, 2003 incident with C.O. Johnson

and Captains Pritchard and Woodard (*id.* at 37);  March 23 and 24, 2003 incidents involving

C.O. Ross and Captains Woodard and Esterkine, among others (*id.* at 38-43); and, a brief

discussion of the events leading to her resignation under "severe emotion[al] and mental stress"

on July 22, 2003.  (*Id.* at 42.)

The EEOC apparently rejected plaintiff's charge as insufficient for failure to submit a

concise statement of facts.[4]  Plaintiff's attorney then sent a letter which read, "Pursuant to your

request, enclosed please find the original charge of harassment filed by this office together with a

concise statement of facts.  When we last spoke, you informed me that I would not have to

include supporting documents since they are already in your possession."  (Bogni Decl., Ex. E.)

This mailing was received by the EEOC on January 27, 2004, and contained another copy of the

original charge reading "See Attached."  (*Id.*)  This time, however, plaintiff had appended a

Statement of Facts regarding the particulars of plaintiff's claim.  This statement read:

> 1. Ms. Trinidad was a corrections officer … Her main functions were to police inmates
> incarcerated at the Adolescent Reception Detention Center.  *Ms. Trinidad has been the
> subject of sexual harassment caused by a fellow corrections officer, William Berkeley.*
> 2. *Ms. Trinidad has issued complaints of harassment against Mr. Berkeley and Captain
> Patterson on several occasions.*  Copies of the reports were previously submitted to your

---

[4] The EEOC has promulgated a regulation that requires a charge to contain "[a] clear and concise statement of the facts, including pertinent dates, constituting the alleged unlawful employment practices." 29 C.F.R. § 1601.12(a)(3).  "Notwithstanding the provisions of paragraph (a) of this section, a charge is sufficient when the Commission receives from the person making the charge a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of."  29 C.F.R. § 1601.12(b).

office. The reports are entitled "Department of Corrections" Interdepartmental Memorandum, dated July 1, 2001 and March 22, 2002. 3. These first two complaints, alleging sexual harassment, creating a hostile work environment, have subsequently caused Ms. Trinidad to be retaliated against. The retaliation included, but is not limited to the following: firearm was confiscated (see memorandum dated Nov. 12, 2002); incessant scrutiny by Ms. Trinidad's supervising officers resulting in a deterioration of her work environment. 4.) The work environment deteriorated to such an extent that Ms. Trinidad was forced to resign her position.

(*Id.* (emphasis supplied.)) Significantly, this Statement of Facts contained no mention of Bailey, or any allegations stemming from his relationship with plaintiff.[5] On February 11, 2004, the EEOC sent plaintiff a "right-to-sue" letter, indicating that based upon its investigation, it was unable to conclude that the information obtained established a violation of the requisite statute. (Bogni Decl., Ex. G.)

*Plaintiff's Amended Complaint*

On April 29, 2004, plaintiff filed her Complaint in this action, and amended it on January 17, 2005. Plaintiff alleged that Deputy Warden Bailey "subjected the Plaintiff to unwelcome sexual advances" on or about June 12, 2000, and "intimated [that] should Plaintiff agree to a date, he would see to it that Plaintiff would receive work related benefits[;] if Plaintiff did not, she would suffer consequences." (Am. Compl. ¶¶10-11.) Plaintiff thus "reluctantly agreed and, among other things, as a result, the Plaintiff was allowed to leave work early without diminution

_____

[5] This failure thus raises a serious administrative exhaustion problem, one which plaintiff treats somewhat cavalierly in her opposition papers. *See, e.g., Legnani v. Alitalia Linee Aeree Italiane, S.P.A*, 274 F.3d 683, 686 (2d Cir. 2001); *Holtz v. Rockefeller & Co*., 258 F.3d 62, 82-83 (2d Cir. 2001); *Fitzgerald v. Henderson*, 251 F.3d 345, 360 (2d Cir. 2001); *Francis v. City of New York*, 235 F.3d 763, 768 (2d Cir. 2000); *Butts v. City of New York Dep't of Hous. Pres. & Dev*., 990 F.2d 1397, 1401 (2d Cir. 1993); *Miller v. Int'l Telephone and Telegraph Corp*., 755 F.2d 20, 25 (2d Cir. 1985). However, in light of the other procedural and substantive infirmities to plaintiff's action, the Court need not address this issue. *Francis*, 235 F.3d at 768 (presentation of a Title VII claim to the EEOC, while "an essential element of Title VII's statutory scheme, and one with which defendants are entitled to insist that plaintiffs comply," is not a jurisdictional prerequisite).

of payment and her requests for transfer to be transferred to a more preferential post were finally granted." (*Id.* at ¶12.)

The Amended Complaint further alleged that plaintiff "ended the relationship with Deputy Warden Bailey in or about August 2001, to which Deputy Warden Bailey responded by becoming upset and irate … From September 2001 until July 22, 2003, the Plaintiff was subjected to severe and pervasive acts of sexual harassment and differential treatment by the individual defendant [Bailey] which created a hostile work environment and affected the terms and conditions of Plaintiff's employment." (*Id.* at ¶15.)  "The Defendant, NYC Department of Corrections had actual and constructive notice of the harassing conduct but failed to take any remedial action to stop it …  As a result of the abusive work environment, the Plaintiff was forced to resign her position, as said resignation was the only fitting response." (*Id.* at ¶¶16-17.) Plaintiff "seeks redress for injuries sustained as a result of Defendant's hostile actions toward the Plaintiff on the basis of her gender as well as Defendant's negligent and intentional infliction of emotional distress" pursuant "to Title VII … New York [state and city] Human Rights Law … [and] Common Law Tort. (*Id.* at ¶1.)

*Plaintiff's testimony*

While plaintiff alleged in her Amended Complaint that she was subjected to a hostile work environment by defendant Bailey, she testified that she had almost no contact with Bailey after their relationship ended in early 2001, and was not even aware that he had transferred out of ARDC by the end of that year.  (Mar. 24 Trinidad Dep. 34-35, 81.)  Indeed, she testified that, with the exception of making other DOC employees aware of their relationship while it was extant, and informing her she had to pay for a $22 parking fee she incurred in the course of her duties (*id.* at 59, 73), Bailey did nothing directly to affect the terms and conditions of her

employment in any adverse manner.  All the acts of hostility that she complained of experiencing at her deposition were acts of co-workers or other supervisors.  As she explained at length when asked about her experiences following the break-up:

> There was an officer … who opened the door on me while I was going to the bathroom and there were inmates and other officers in the room and nobody did anything to stop her from opening the door.  I was assaulted by a captain after the relationship stopped … [Efforts that plaintiff made to be removed from a designation of excessive absenteeism were ignored]  … I was suspended but the use of force was put into—the use of force that Bailey had said that they put aside was now again reinstated and I was suspended for 10 days on that use of force ...  An inmate assaulted me and threatened me and I requested to have my weapon given me back to me and the deputy warden of security there had told me to my face that he took my paperwork and ripped it up and he said that I was a troublemaker and I should be quiet.  My weapon was never given back to me …When I reported the Officer Berkeley incident to my union delegate and I gave everybody a copy of my report that I gave to the EEO office, it was told to me from another officer that this particular report was hanging in the men's locker room and that everybody read it … [A] vacation day was taken from me by Sandra Langston for not reporting that I was back at home when I was medically monitored at home and I was supposed to log back in to the HMD office … I was written up several times by [GMDC personnel] for not showing up [for uniform inspection] when parts of my uniform was stolen from my locker … The day that my stuff was stolen from my locker, I was told to go to the police department and report it on my own time … which I did.  I was also written up for not reporting to a captain when I wouldn't get a relief to come to my post for me to report to him … They also wrote me up [twice] for not reporting to them with my uniform which was a big thing … Every time I tried to talk to somebody … concerning certain things that was going on, I was always given a cold shoulder.  I tried to talk to the union … about what was happening to me with Officer Berkeley and Captain Patterson, and I felt like they … were passive in my case.

(Mar. 24 Trinidad Dep. 75-79.)

When asked what led her to believe that any of the incidents with various DOC personnel were linked in any manner to Bailey, she did not know.  "I want to make one thing clear,  I said some of these incidents … what happened to me may have, I don't know who knows him [Bailey] personally, I don't know who he sees, what he does on his time out of the jail.  For all I know, he knows all these people, so, I don't know."  (Apr. 14 Trinidad Dep. 128.)  When asked whether the June 12, 2001 incident with Berkeley was "related in any way to Bailey," plaintiff

testified: "I don't know.  It could have been.  He could have been friends with him on the outside.  I don't know his personal level of his friends or who he hangs around with, but it … could have been." (Apr. 14 Trinidad Dep. 127.)  Counsel also asked plaintiff whether the March 2002 incident with Captain Patterson, which occurred over a year after the demise of plaintiff's relationship with Bailey, or other encounters between the two "were related to [her] relationship with Bailey." (*Id.*)  Plaintiff speculated in response that Patterson "was interested [in Bailey], and she looked upset, I was seeing him at one point, and she was against it because I was a woman and she was a woman and I was dating him, she wanted to date him, I am not sure, I am not sure what her feelings were, why she did it, but it's my belief that [Patterson's behavior towards her] did stem from that relationship." (*Id.* at 129.)  Plaintiff admitted that she did "not know for a fact that [Bailey pressured Patterson to alter her treatment of plaintiff.]  I am not sure of exactly what happened, but I do know that her behavior changed at one point towards me." (*Id.* at 129.)  When asked what gave rise to this belief, plaintiff testified that it was "because it happened after my relationship was over with him and that's when a lot of other things started snowballing." (*Id.*)

Counsel also asked plaintiff about any linkage between Bailey and the alleged acts of harassment encounters she had described in another, shorter synopsis she prepared for her attorney, which involved DOC employees Chin, Langston, Durante, Duffy, Garcia, Johnson, Pritchard, Woodard, Ross, Gordon, Jergensen, Escarone, and Brophy.  (*Id.* at 130-39; Ex. L to Bogni Decl.)  She offered no evidence of any such connection, other than speculation that Bailey could have somehow passed on a message or suggestion to others "to give [her] a hard time all the time … I am not sure what happened.  Like I said, I can't explain these people's behavior to me." (Apr. 14 Trinidad Dep. 134, 136.)

**DISCUSSION**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 57 (2d Cir. 1997) (quoting Fed. R. Civ. P. 56(c)). Summary judgment may also be granted when the opposing party fails to establish an element essential to that party's case and on which that party would bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 321 (1986); *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 61 (2d Cir. 1998). In reviewing the record, the district court must assess the evidence in "the light most favorable to the non-moving party," resolve all ambiguities, and "draw all reasonable inferences" in its favor. *Am. Cas. Co. v. Nordic Leasing, Inc.*, 42 F.3d 725, 728 (2d Cir. 1994); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Non-movants "cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts," nor can they "defeat the motion through mere speculation or conjecture." *Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 574 (2d Cir. 2005) (citation omitted). To survive summary judgment, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial. *See Anderson*, 477 U.S. at 256-57; *Gross v. Nat'l Broad. Co.*, 232 F. Supp. 2d 58, 67 (S.D.N.Y. 2002).

Unsworn material, such as the two handwritten synopses plaintiff testified she prepared as general background for her attorney's review (Apr. 14 Trinidad Dep. 122-23, 139-41),[6] are "inadmissible hearsay that are an insufficient basis for opposing a motion for summary judgment," and the factual assertions therein will be disregarded by the Court for purposes of deciding this motion. *Capobianco v. City of New York*, 422 F.3d 47, 55 (2d. Cir. 2005) (citing Fed. R. Civ. P. 56(e)); *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999) (the production of inadmissible hearsay fails as evidence sufficient to create a genuine issue for trial); *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) ("[I]t is appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgment."). *United States v. All Right, Title & Interest in Real Prop. & Appurtenances*, 77 F.3d 648, 657-58 (2d Cir. 1996)); *Dukes v. City of New York*, 879 F. Supp. 335, 343 (S.D.N.Y. 1995) ("Unsworn statements are not admissible to controvert a summary judgment motion").  Plaintiff has not produced an affidavit swearing to the events in these narratives to the Court, and thus, for purposes of identifying material fact in this case, the Court will rely on the descriptions of incidents as they appear in plaintiff's deposition testimony.

Title VII provides that "[i]t shall be unlawful for an employer ... to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of the individual's … sex."  42 U.S.C. § 2000e-2(a)(1) (2000).  It is well-settled under Second Circuit law that individuals are not "subject to liability under Title VII." *Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000); *Tomka v. Seiler Corp.*, 66 F.3d 1295,

---

[6] One of these documents was *appended* to plaintiff's sworn EEOC complaint but was not sworn to itself, and appears to have been prepared separately, given plaintiff's testimony.  Plaintiff's complaint was verified, but by plaintiff's counsel; regardless, it contains no detailed factual averments that do not appear in her deposition testimony.  *Cf. Fitzgerald v. Henderson*, 251 F.3d 345, 361 (2d Cir. 2001) (factual assertions sworn to by plaintiff in EEOC complaint and verified pleading are to be accepted as true for summary judgment purposes).

1313 (2d Cir. 1996) (finding that individuals "may not be held personally liable under Title VII."), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998); *Lennon v. NYC*, 392 F. Supp. 2d 630, 640 (S.D.N.Y. 2005). Although defendants have not raised this issue, to the extent plaintiff seeks to hold Bailey personally liable under Title VII for any sexual harassment, or the creation of a hostile work environment, this claim cannot proceed.

*Plaintiff's quid pro quo claim under Title VII.*

Plaintiff may bring her claim for gender discrimination under Title VII "only for acts of discrimination that occurred within the statutory period set by 42 U.S.C. § 2000e-5(e)(1)," which would, in the instant case, be acts that occurred 300 days or less before the filing of her EEOC charge, or between January 21, 2003 and plaintiff's resignation on July 23, 2003. *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 220 (2d Cir. 2004); *Nicholls v. Brookdale University Hosp. and Medical Center*, 2005 WL 1521239, at *19 (E.D.N.Y. Jun. 22, 2005) (noting that Title VII "precludes recovery for *discrete* acts of discrimination or retaliation that occur outside the statutory time period [such as termination, failure to promote, denial of transfer, or refusal to hire], even if other acts of discrimination occurred within the statutory time period").

It is undisputed here that plaintiff's relationship with defendant Bailey ended long before the filing of her EEOC charge on November 17, 2003. The complaint in this action, however, alleges that Bailey 1) coerced her into entering the relationship by promising work-related benefits and 2) subsequently subjected her from September 2001 to July 2003 "to severe and pervasive acts of sexual harassment and differential treatment … which created a hostile work environment and affected the terms and conditions of Plaintiff's employment." (Am. Compl ¶15.) More specifically, with respect to the later allegation against Bailey, plaintiff urges the

Court to consider every incident of reprimand or conflict with DOC colleagues as somehow engineered by Bailey in retaliation for the termination of their relationship. (Pl's Opp. Mem. at 6-7).[7] Plaintiff makes these allegations despite the fact it is undisputed that the relationship between the two ended at some point between February and May 2001, and Bailey left the ARDC in December 2001. (Defs' 56.1 Statement ¶9.)

In broad terms, a distinction may be made between sexual harassment claims "in which threats are carried out and those where they are not or are absent altogether." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 751 (1998). These two forms of sexual harassment have been known in the case law, respectively, as *quid pro quo* harassment[8] and hostile work environment. *Distasio v. Perkins Elmer Corp.*, 157 F.3d 53, 62 (2d Cir. 1998) ("A plaintiff seeking relief against an employer for sexual harassment in the work place can proceed under two theories: *quid pro quo* harassment and a hostile work environment."); *Hill v. Children's Village*, 196 F. Supp. 2d 389, 393 (S.D.N.Y. 2002) (noting *Burlington* and indicating that the distinction between the two may serve "as a convenient shorthand for distinguishing cases where threats are carried out from those where they are not").[9]

---

[7] This assertion bears scant similarity to the almost two years' worth of "severe and pervasive acts of sexual harassment and differential treatment by the *individual* defendant" that plaintiff accused Bailey of in her complaint in this action. (Am. Compl. ¶15.)

[8] "To establish a *prima facie* case of *quid pro quo* harassment, a plaintiff must present evidence that she was subject to unwelcome sexual conduct, and that her reaction to that conduct was then used as the basis for decisions affecting the compensation, terms, conditions or privileges of her employment. It is enough to show that the supervisor used the employee's acceptance or rejection of his advances as the basis for such a decision." *Fitzgerald v. Henderson*, 251 F.3d 345, 356 (2d Cir. 2001) (internal citations and quotations omitted).

[9] However, in the *Burlington Industries* case, the Supreme Court concluded that "[t]he terms *quid pro quo* and hostile work environment are helpful, perhaps, in making a rough demarcation between cases [where explicit threats are made and carried out and those where they are not], but beyond this are of limited utility." *Burlington Industries, Inc.*, 534 U.S. at 751. The Second Circuit has acknowledged this clarification, and noted that "in light of recent developments in sexual harassment doctrine, … [t]he law does not create separate causes of action for sex

Here, while plaintiff has referenced some *quid pro quo* aspects to her relationship with Bailey with her allegations that the individual defendant, acting in a supervisory capacity, coerced her against her will into entering the relationship with him in 2001 by promising and providing work-relating benefits therewith, *Jin v. Metropolitan Life Ins. Co.*, 310 F.3d 84, 99 (2d. Cir. 2002) ("Title VII should not be read to punish the victims of sexual harassment who surrender to unwelcome sexual encounters.") (internal citations omitted), she appears to concede that the *quid pro quo* nature of the Bailey relationship itself is not actionable as time-barred. *See Fitzgerald v. Henderson*, 251 F.3d 345, 364-65 (2d Cir. 2001) (plaintiff's untimely claim that defendant "had [originally] subjected her to unwanted sexual overtures" would not be "saved by the continuing violation theory,"[10] even [t]hough [defendant subsequently] "proceeded … to harass [plaintiff] for having rejected his propositions, [as the] abuse was qualitatively different from his earlier conduct … even if [it was] motivated by [plaintiff's] rejection of his sexual propositions, [it] cannot reasonably be viewed as a continuation of such propositions."); *Bracci v. N.Y.S. Dept. of Correctional Services*, 2005 WL 2437029, at *9 (N.D.N.Y. Sept. 30, 2005) (plaintiff's claim of *quid pro quo* sexual harassment perpetrated by plaintiff's supervisor, who demanded a romantic relationship in exchange for workplace benefits (to which plaintiff

---

discrimination depending on the reason the employer denies a woman a job or a job benefit …What matters, instead, is simply whether an employment action was based on plaintiff's sex. Similarly, there is no reason to create a *separate doctrinal category* for employers who make women's workplace success contingent on submission to a supervisor's sexual demands. For such a sexual *quid pro* is just another way in which an employer, in violation of Title VII, makes an employee's sex relevant to an employment decision." *Gregory v. Daly*, 243 F.3d 687, 698-99 (2d Cir. 2001) (emphasis in original); *Yerry v. Pizza Hut of Southeast Kansas*, 186 F. Supp. 2d 178, 183 (N.D.N.Y. 2002) ("The Second Circuit has recently clarified that there is no need to distinguish between 'hostile work environment' sexual harassment and 'quid pro quo' harassment … After *Gregory*, it is clear that allegations of 'quid pro quo' sexual harassment do not state an independent claim, but are instead merely one type of factual allegation to support a cause of action under Title VII.").

[10] *See infra* note 11 and accompanying text.

unwillingly capitulated for over a year), dismissed as untimely because there was no "conduct bringing this claim into the limitations period"); *Moran v. Fashion Institute of Technology*, 2002 WL 31288272, at *3 (S.D.N.Y. Oct. 7, 2002) ("Because some of the alleged acts constituting the hostile work environment are within the statutory period, the Court can consider all of [plaintiff's] allegations of a hostile work environment [but his] *quid pro quo* claims of sexual harassment, however, are time-barred and therefore cannot be considered by this Court."). Indeed, plaintiff here has styled her federal claim as one involving a hostile work environment inflicted directly by colleagues other than Bailey, and chooses to make the *quid pro quo* argument only under state and city law.

Nevertheless, courts, in determining whether "there is a sufficient basis to infer sex-based discrimination," are to look at the "totality of the circumstances," *Gregory v. Daly*, 243 F.3d 687, 700 (2d Cir. 2001), and thus, the Court will consider evidence of the prior relationship, and its end, for purposes of examining plaintiff's hostile work environment claim. *See Fitzgerald* at 365 (in rejecting time-barred claims, "we do not mean to suggest that evidence of [defendant's time-barred] sexual advances and [plaintiff's] rebuffs [thereof] … would not be relevant or admissible to show [defendant's] motivation for his [later hostility]," as a "plaintiff complaining of sexual harassment must show that the treatment of which she complains was motivated by her gender … A statute of limitations does not operate to bar the introduction of evidence that predates the commencement of the limitations period but that is relevant to events during the period.") A discussion of plaintiff's hostile work environment claim, and its timeliness, follows.

*Plaintiff's hostile work environment claim under Title VII*

A hostile work environment arises in violation of Title VII "when the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Dawson v. County of Westchester*, 373 F.3d 265, 272-73 (2d Cir. 2004) (internal citations and quotation marks omitted). A specific basis must also exist "for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002). "As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Id.* (internal citations and quotations omitted). Conduct that is "merely offensive, unprofessional or childish is not discriminatory conduct proscribed by Title VII." *Cosgrove v. Federal Home Loan Bank of N.Y.*, 1999 WL 163218, at *20 (S.D.N.Y. Mar. 23, 1999). Specifically, a plaintiff "must establish both that he subjectively perceived the environment to be abusive and that a reasonable person would have perceived it as such." *Perks v. Town of Huntington*, 251 F. Supp. 2d 1143, 1155 (E.D.N.Y. 2003).

Courts will "look to the totality of the circumstances in determining whether a plaintiff has established a hostile work environment claim, considering factors including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.... The test is whether the harassment is of such quality or quantity as to meet the standard of severe or pervasive harassment or abuse." *Dawson* at 272-73 (internal citations and quotation marks omitted). "In short, a plaintiff alleging a hostile work environment must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents

were sufficiently continuous and concerted to have altered the conditions of her working environment." *Alfano* at 374.

1. *The timeliness of the hostile work environment claim*

As aforementioned, plaintiff accuses Bailey of subjecting her, from September 2001 to July 2003, "to severe and pervasive acts of sexual harassment and differential treatment … which created a hostile work environment and affected the terms and conditions of Plaintiff's employment." (Am. Compl. ¶15.) More specifically, plaintiff in her opposition asks the Court to consider every incident of reprimand or conflict with DOC colleagues as deliberately orchestrated by Bailey, or at the very least, tied in some way to the termination of their relationship. In support of this theory, plaintiff invokes the "continuing violation" doctrine to argue that her cause of action is not time-barred.[11]  Claims for a hostile work environment, which by their nature will involve a series of incidents, may properly include acts outside the 300-day period "[p]rovided that an act contributing to the claim occurs within the filing period," *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002); *Cobian v. City of New York*, 2006 WL 212292, at *2  (S.D.N.Y. Jan. 24, 2006) ("Acts occurring outside the limitations period may be considered in support of continuing violation claims, such as hostile environment claims, where one act contributing to the claim occurred within the limitations period."); *Huaman v. American Airlines, Inc.*, 2005 WL 2413189, at *4  (E.D.N.Y. Sept. 29, 2005) ("For hostile environment claims, provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the

---

[11] As a general matter, the continuing violation doctrine "is heavily disfavored in the Second Circuit" and courts have been "loath" to apply it absent a showing of "compelling circumstances."  *Stephens v. Hofstra University School of Law*, 2005 WL 1505601, at *4 (E.D.N.Y. Jun. 24, 2005); *Falinski v. Kuntz*, 38 F. Supp. 2d 250, 257 (S.D.N.Y. 1999).

purposes of determining liability, unless the act within the filing had no relation to the acts outside the period.") (cites to *Morgan* omitted).

Plaintiff here, however, has not specified what hostile conduct occurred subsequent to January 21, 2003 that would support her assertion. In terms of admissible evidence that would permit this claim to survive at this stage, plaintiff points in her 56.1 Statement only to two pages in her deposition, where she begins a lengthy answer that mentions a variety of negative events that occurred to her in the two and one-half year period between the break-up and her resignation: an "assault" from a female captain; a female officer who opened the door on her while she used the bathroom; her unsuccessful efforts to be removed from a designation of excessive absenteeism; her suspension for use of force; the failure to return her weapon; being called a "troublemaker" by an unidentified employee; the docking of a vacation day for "not reporting that" she was at home being "medically monitored"; the receipt of two write-ups for apparent failures to appear for uniform inspection; the order she received to report a break-in of her locker to the police department on her own time; receiving a write-up for failure to report to a captain; her hearing that someone hung her report of the Officer Berkeley incident in the men's locker room; and, the "cold shoulder" from the union she experienced. (Pl.'s 56.1 Statement ¶5; Mar. 24 Trinidad Dep. 74-79.) There is no admissible evidence in the record that indicates when these incidents occurred, and even if the Court were to attempt to match this vague testimony to the descriptions of particular dated incidents in her unsworn handwritten summaries to her counsel, all but possibly the locker break-in and a couple of her write-ups would be unidentifiable as falling within the applicable time period. "To bring a claim within the continuing violation exception, a plaintiff must at the very least allege that one act of discrimination in furtherance of the ongoing policy occurred within the limitations period."

*Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 220 (2d Cir. 2004); *Chan v. NYU Downtown Hosp.*, 2006 WL 345853, *at* *6 (S.D.N.Y. Feb. 14, 2006) (undated allegation from plaintiff insufficient to create a continuing violation "because Plaintiff specifies no act of sexual discrimination or hostility that occurred within the 300-day period").

2. *Plaintiff has not established that any acts of hostility were linked to the Bailey relationship*

Even if plaintiff's hostile work environment claim were timely, it is "axiomatic that mistreatment at work, whether through subjection to a hostile environment or through such concrete deprivations as being fired or being denied a promotion, is actionable under Title VII *only when it occurs because of an employee's sex*, or other protected characteristic." *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) (emphasis added). While "[f]acially neutral incidents may be included, of course, among the totality of the circumstances that courts consider in any hostile work environment claim [so long as a] reasonable fact-finder could conclude that they were, in fact, based on sex," this inference "requires some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory." *Alfano v. Costello*, 294 F.3d 365, 378 (2d Cir. 2002); *Howley v. Town of Stratford*, 217 F.3d 141, 155-56 (2d Cir. 2000) (holding that fact-finder could reasonably infer that facially sex-neutral incidents were sex-based where the perpetrator had previously made sexually explicit and derogatory statements); *Svenningsen v. College of Staten Island*, 2003 WL 21143076, at *2 (E.D.N.Y. Mar. 28, 2003) ("The incidents comprising a hostile work environment need not make any reference to the trait or condition on the basis of which the discrimination has occurred, so long as the

incidents can reasonably be interpreted as having taken place on the basis of that trait or condition.")

There is scant evidence here that any of the encounters plaintiff has referenced obliquely in her testimony were "related to her being a woman," *id.* at 255, or, indeed, linked to her relationship with Bailey in any manner. Outside of the Bailey relationship itself, the only incident that implicitly refers to Bailey would be the June 2001 dispute with Officer Berkeley, which goes unmentioned in plaintiff's 56.1 Statement, where Berkeley "made sexual remarks about me and my clothing … he called me a bitch [and said] 'I don't care who you [expletive deleted] in the department' … you have the report." (Apr. 14 Trinidad Dep 126).

In an apparent effort to tie the stimulus behind other incidents to her gender, plaintiff makes conclusory allegations in her opposition papers that Bailey was somehow behind the conflicts she experienced with a wide variety of male and female colleagues as part of an elaborate and extended campaign of retaliation for their break-up. Theoretically, if Bailey had embarked on such efforts, gender discrimination against plaintiff could be cognizable under Title VII. *See Babcock v. Frank*, 729 F. Supp. 279, 287-88 (S.D.N.Y. 1990) (noting that an "employer who threatens a penalty if the employee will not continue the physical relationship is using gender as the basis for job benefits [and to] assume as a matter of law [that such action is] discrimination predicated not on the basis of gender, but on the basis of the failed interpersonal relationship … is as flawed a proposition under Title VII as the corollary that 'ordinary' sexual harassment does not violate Title VII when the employer's asserted purpose is the establishment of a 'new interpersonal relationship'") (internal citations and quotations omitted); *see also Perks v. Town of Huntington*, 251 F. Supp. 2d 1143, 1157 (E.D.N.Y. 2003).

However, plaintiff has pointed to no evidence to support the conclusion that Bailey took *any* such steps to encourage other DOC personnel to harass plaintiff. There is nothing but wild speculation to that effect, particularly considering that Bailey was transferred to a different unit approximately two and one-half years before plaintiff resigned her position in July 2003. In fact, defendants' counsel explored this issue at length during plaintiff's deposition, and she repeatedly conceded she had no reason to believe Bailey had anything to do with her various run-ins with colleagues, other than the fact that the incidents occurred in the years following their break-up. (*See* Apr. 14 Trinidad Dep. 127, 129, 130-39.) Thus, plaintiff has not "carried her burden of showing—even for purposes of avoiding summary judgment—that the harassment she faced was rooted in her sex." *Brown* at 255 (finding the gender-based component of a hostile work environment claim unmet where the "bulk of the behavior [plaintiff cited], though often highly cruel and vulgar, related either to her union-related conflict … or to her purported affair with [a work colleague … Plaintiff] never suggested that [her co-workers'] antagonism toward her was related to her being a woman … Instead, [she gave] every indication that, in her view, what made her tormentors' conduct 'sexual harassment' was the fact that the behavior touched on matters of sexuality, i.e. her purported sexual relationship with [a co-worker], and not that it was a form of sex discrimination.").

Examining the totality of the circumstances here, "most of which comprise unrebutted facially neutral behavior that plaintiff has failed to clothe in discriminatory dress," plaintiff's claim here thus "clearly fails to meet the necessary standard" for actionable gender hostility. *Wood v. Sophie Davis School*, 2003 WL 22966288, at *8 (S.D.N.Y. Dec. 15, 2003). Even considering the vague description in her testimony of the incident (or possibly, incidents, as plaintiff's testimony is unclear) in 2001 where Officer Berkeley allegedly called her a bitch and

"made sexual remarks," such evidence of obnoxiousness would not establish a hostile work environment claim. Timeliness issues aside, such isolated, insensitive comments during plaintiff's five and one-half years of employment do not meet the standard of severe or pervasive harassment or abuse. "[W]e are mindful that Title VII does not establish a 'general civility code' for the American workplace … Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment." *Petrosino v. Bell Atlantic*, 385 F.3d 210, 223 (2d Cir. 2004); *Mark v. Brookdale University Hosp.*, 2005 WL 1521185, at *27 (E.D.N.Y. June 22, 2005) (Weinstein, J.) ("Plaintiff's hostile work environment claims are premised upon two alleged isolated remarks … [these] comments, assumed true only for purposes of summary judgment, are insufficient to give rise to a hostile environment claim. The 'blimp' remark, assumed … to be in reference to plaintiff's pregnancy, combined with the 'black bitch' comment, are not sufficiently frequent and pervasive to support an actionable hostile environment claim."); *Young v. Rogers & Wells LLP.*, 2002 WL 31496205, at *9 (S.D.N.Y. Nov. 6, 2002) (when taken in context, a handful of rude or offensive comments, while insensitive, did not establish a hostile work environment).

*Plaintiff's constructive discharge claim*

Constructive discharge of an employee will occur only "when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily … Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Chamblee v. Harris & Harris, Inc.*, 154 F.Supp.2d 670, 675 (S.D.N.Y. 2001). With respect to plaintiff's claim here, "[c]reation of a hostile work environment is a necessary predicate to a hostile-environment constructive discharge case." *Pennsylvania State*

*Police v. Suders*, 542 U.S. 129, 149 (2004). Plaintiff's failure to establish the discriminatory element of her hostile work environment claim is therefore fatal to her constructive discharge claim. *Thomas v. Bergdorf Goodman, Inc.*, 2004 WL 2979960, at *6 (S.D.N.Y. Dec. 22, 2004) ("[I]in order to state a prima facie case for constructive discharge, a plaintiff must establish that the constructive discharge occurred in circumstances giving rise to an inference of discrimination on the basis of her membership in a protected class.") (citations and quotations omitted).

Furthermore, plaintiff's testimony establishes that her working conditions were not so intolerable that her resignation was compelled. Plaintiff, in fact, viewed her decision to resign as a mistake, and appears to be aggrieved by the *failure* to reinstate her following her resignation. "And I also asked the union, less than a month after I resigned, I asked to be reinstated because I felt as though I had made a mistake. When I resigned I handled things the wrong way, and I wanted to be reinstated, and they told me no." (Mar. 24 Trinidad Dep. 78-79.) *Cf. Suders* at 149 ("For an atmosphere of sexual harassment or hostility to be actionable … the offending behavior must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment ... [However, a] hostile-environment *constructive discharge* claim entails something *more*: … working conditions so intolerable that a reasonable person would have felt compelled to resign …Unless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress.") (emphasis added) (internal citations and quotations omitted); *Thomas* at *6 ("Constructive discharge can be seen as an aggravated case of hostile work environment [which occurs where an] employer, rather than terminating her, deliberately makes working conditions so intolerable that the employee is forced into involuntary resignation … Intolerable working conditions have been described as conditions so difficult or unpleasant that a reasonable person

in the employee's shoes would have felt compelled to resign.") (citations and quotations omitted).

*Plaintiff's state law claims*

Having disposed of the federal claims for gender discrimination over which this court has original jurisdiction, the court declines to exercise supplemental jurisdiction over plaintiff's state law claims. *See* 28 U.S.C. § 1367(c)(3); *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, … the state claims should be dismissed as well."); *Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 60 (2d Cir. 2004) ("When the balance of factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state law claims remain, the federal court should … [dismiss] the case without prejudice") (internal citation omitted); *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003) (where "federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims") *Jeffers v. Doe*, 2005 WL 2240686, at *7 (N.D.N.Y. Aug. 17, 2005) (noting that 28 U.S.C. § 1367(d) will protect plaintiff's ability to bring state claims in state court if the federal court dismisses those claims after the expiration of the applicable state statute of limitations, by tolling the statute of limitations for any such claims while they are pending and for a period of 30 days after they are dismissed); *Henkin v. Forest Laboratories, Inc*., 2003 WL 749236, at *10 (S.D.N.Y. Mar. 5, 2003) (granting summary judgment on federal discrimination and other claims, and declining to exercise supplemental jurisdiction in part because "plaintiff will not be barred from bringing her claim before the state court, since her claim is tolled under New York Civil Practice Law §

205(a)"); *LaBella v. New York City Admin. for Children's Services*, 2005 WL 2077192, at \*26 (E.D.N.Y. Mar. 28, 2005) (dismissing state law claims without prejudice following grant of summary judgment on federal claims in part because CPLR § 205(a) will temporarily toll the statute of limitations in state court for recommencement purposes); *Historical Truth Productions, Inc. v. Sony Pictures Entertainment, Inc.*, 1995 WL 693189, at \*14 (S.D.N.Y. Nov. 22, 1995) (declining to exercise supplemental jurisdiction following summary judgment of federal claim, because it had "been dismissed at a relatively early phase of the litigation and well in advance of trial, so economy would not be greatly served by retaining jurisdiction."); *Mayer v. Oil Field Systems Corp.*, 620 F. Supp. 76, 77-78 (S.D.N.Y. 1985) ("The exercise of pendent jurisdiction in [a] case where the federal claims have been dismissed on summary judgment before trial would be inappropriate absent exceptional circumstances. Since [New York's CPLR § 205] allow[s] a plaintiff to recommence a dismissed suit within six months without regard to the statute of limitations, [plaintiff] will not be unduly prejudiced by the dismissal of her state law claims.")

Accordingly, plaintiff's state law claims are dismissed without prejudice.

## CONCLUSION

For the foregoing reasons, the City's motion for summary judgment [17] is granted. The Clerk of the Court is directed to close this case.

Dated: New York, New York
March 21, 2006

Richard J. Holwell
United States District Judge

26